UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: | ) |
| | ) |
| DORNIER AVIATION (NORTH AMERICA), INC. | ) Case No. 02-82003-SSM<br>) Chapter 11 |
| | ) |
| Debtor | ) |
| | ) |
| DANA LIQUIDATING TRUST | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) Adversary Proceeding No. 03-1338 |
| | ) |
| HAINAN AIRLINES CO., LTD. | ) |
| | ) |
| Defendant/Third Party Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| DR. EBERHARD BRAUN *et al.* | ) |
| | ) |
| Third Party Defendants | ) |

**MEMORANDUM OPINION**

The parties are before the court on a motion for partial summary judgment brought

by the DANA Liquidating Trust ("DLT") against Hainan Airlines Co., Ltd. ("Hainan").

This litigation arises out of transactions involving hundreds of spare aircraft parts.  The

DLT's motion seeks summary judgment with respect to three issues: (1) whether Hainan's

warranty counterclaims for breach of an implied warranty of merchantability and for

consequential damages are barred by the terms of sale; (2) whether certain "audit invoices"

1

are obligations owed exclusively to the debtor, Dornier Aviation (North America), Inc.

("DANA"); and (3) whether DANA or its indirect parent, Fairchild Dornier GmbH ("FDG")

owns the accounts receivables generated by the consumption of certain spare parts in excess

of the $1,990,555.35 claimed by FDG in its pleadings.  After considering the pleadings and

the arguments made by the parties at a hearing held on November 14, 2005, this court finds

that the DLT is entitled to partial summary judgment with respect to the warranty

counterclaims asserted by Hainan and with respect to a portion of the audit invoices.

<u>Background</u>

On August 20, 1999, Hainan and Dornier Luftfahrt GmbH, FDG's predecessor[1],

entered into an agreement for the purchase of several aircraft manufactured by FDG.  On

April 30, 2000, Hainan and FDG entered into an agreement for the consignment of spare

parts for use with the aircraft.  Under the terms of the consignment agreement, FDG agreed

to provide Hainan with an inventory of spare parts to be stored in a consignment warehouse

located at Hainan's primary maintenance base in Hainan, China.  DANA was an indirect

subsidiary of FDG that provided sales and maintenance support to FDG in North America and

China, and accordingly participated in the performance of the consignment agreement.  Under

the terms of the consignment agreement, Hainan was required to issue a notice of removal when

a part was removed from the warehouse.  However, after conducting an audit of the warehouse

in November of 2002, DANA discovered that Hainan had removed several parts from the

warehouse without issuing a notice of removal.  Upon completion of the audit, DANA issued

---

[1] For convenience, both the original company and its successor will be referred to as "FDG."

seven invoices totaling $1,629,277.33 to Pacific American Corporation ("Pacific American"),

Hainan's corporate affiliate and agent, for the missing parts.

Also, between April 2000 and October 2002, Hainan purchased hundreds of spare parts

from FDG and DANA.  Additionally, from January 2000 until January 2003, Pacific American

purchased several hundred spare parts from FDG and DANA on behalf of Hainan.  FDG and

DANA issued invoices to both Hainan and Pacific American for each purchase.  These invoices

totaled $8,333,345.42.  The invoices set forth General Terms and Conditions of Sale, which

contained a warranty disclaimer and limitation of remedy clause, as well as a limitation of

liability clause.  The warranty disclaimer and limitation of remedy clause reads:

WARRANTIES, REMEDIES AND DISCLAIMERS

Seller warrants that the parts and materials shipped and paid for
hereunder will be free from defects in materials and workmanship
for a period of thirty (30) days from the date of shipment. If Buyer
detects a defect in shipped parts or materials and notifies Seller
within 30 days of the date of the shipment, Seller will, at it option,
take one of the following corrective actions:

1.     replace the defective part by shipping a replacement part to
       Buyer at Seller's expense, whereupon Buyer will return the
       defective parts or material to Seller at Buyer's expense: or
2.     request Buyer to return the defective parts or material, at
       Buyer's expense, for repair and return by Seller at Seller's
       expense: or
3.     authorize Buyer to repair the defective part with Seller
       furnished kits/or parts in accordance with Seller's
       instructions.

* * *

EXCEPT FOR THE WARRANTIES SET FORTH IN THIS
ARTICLE AND EXCEPT FOR THE LIMITED WARRANTIES,
IF ANY, EXPRESSLY PROVIDE FOR BY DORNIER
LUFTFAHRT GMBH AND ITS AFFILIATED COMPANIES
FOR PARTS MANUFACTURED BY DORNIER LUFTFAHRT
GMBH OR ITS AFFILIATED COMPANIES, THERE ARE NO

3

> OTHER WARRANTIES, WHETHER EXPRESSED, IMPLIED,
> ORAL OR WRITTEN WITH RESPECT TO THE SHIPPED
> PARTS OR SERVICES FURNISHED BY SELLER
> HEREUNDER INCLUDING, BUT NOT LIMITED TO ANY
> IMPLIED WARRANTY OF MERCHANTABILITY OR
> FITNESS FOR A PARTICULAR PURPOSE, MOREOVER, THE
> REMEDIES PROVIDED IN THIS ARTICLE ARE EXCLUSIVE
> AND IN LIEU OF ALL OTHER REMEDIES.

The limited liability clause reads as follows:

> LIMITATION OF LIABILITY
> IN NO EVENT SHALL SELLER OR DORNIER
> LUFTFAHRT GMBH BE LIABLE FOR ANY LOSS,
> FOREGONE PROFITS OR DECREASE IN REVENUE
> EXPERIENCED BY BUYERS, NOR FOR CONSEQUENTIAL,
> INCIDENTAL, SPECIAL, PUNITIVE, OR EXEMPLARY
> DAMAGES INCURRED OR SUFFERED BY BUYER.

The Terms and Conditions further specify that "[t]his Agreement shall be governed by the laws of the State of Texas without regard to Texas' choice of law principles."

Hainan has made no payment to FDG or DANA for the parts it purchased under the spare parts agreement. Hainan claims that shortly after it began purchasing spare parts from FDG and DANA, it began identifying deficiencies in the parts. According to Hainan, it immediately notified FDG or DANA of the defects, and repeatedly sought remedial action from either FDG or DANA, but the responses were slow or nonexistent. Hainan also claims that when FDG or DANA did provide replacement parts, they too were frequently defective and resulted in the repeated, unscheduled grounding of Hainan's aircraft.

In April 2002, FDG began liquidating insolvency proceedings in Germany. On April 24, 2002, an involuntary petition under chapter 7 of the Bankruptcy Code was filed in this court against DANA. On May 20, 2002, this court entered an order for relief and an order converting the case to chapter 11. By order entered on February 14, 2003, a liquidating plan was confirmed.

4

Under the terms of the plan and the confirmation order, all of DANA's assets and its bankruptcy

avoiding powers were transferred to the DLT.  On December 5, 2003, the DLT filed the current

adversary proceeding to recover monies owed under the purchase invoices.[2]  On April 1, 2005,

Hainan filed its initial third-party complaint against Dr. Eberhard Braun as Insolvency

Administrator for FDG.  On June 28, 2005, the DLT filed a second amended complaint.  On July

14, 2005, Dr. Braun filed his answer to the third-party complaint and asserted counterclaims

against Hainan seeking payment for unpaid invoices totaling $1,990,555.35.  On July 15, 2005,

Hainan filed its answer to the second amended complaint and asserted several counterclaims

against the DLT seeking, among other relief, recovery of actual and consequential damages for

breach of express and implied warranties.  The counterclaims, according to Hainan, were

asserted "not for purpose of affirmative recovery or relief, but solely as offsetting or recouping

affirmative defenses and as a bill of particulars in further support of its . . . affirmative defenses."

<u>Discussion</u>

I.

A  court may grant summary judgment where there is no genuine issue of material fact

and the movant is entitled to judgment as a  matter of law. Fed. R. Civ. P. 56, *incorporated by*

Fed. R. Bankr. P. 7056; *In re T.I. Swartz Clothiers, Inc*., 15 B.R. 590, 592 (Bankr. E.D. Va.

1981) (citing *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur.Co.,* 381 F.2d 245, 249 (4th Cir.

---

[2]  The DLT had previously filed a separate adversary proceeding against Pacific American to
recover the same amounts.  *DANA Liquidating Tr. v. Pacific Am. Corp. (In re Dornier Aviation
(North America) Inc.),* No. 02-82003, A.P. No. 03-1319 (Bankr. E.D. Va.).  That adversary
proceeding is currently proceeding along a parallel track with the current proceeding.

1967)).  Once the moving party shows that there exists no genuine issue of material fact in the

record, the burden shifts to the non-moving party to come forward with specific, material,

admissible facts to show that there is a genuine issue for trial.  In meeting this burden of

production, the party opposing summary judgment may not rely on its own speculation or

unsupported allegations to defeat a summary judgment motion.  *See* Fed. R. Civ. P. 56(e); *Beale*

*v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  If the non-moving party cannot present a genuine

issue of material fact, the court should grant summary judgment for the moving party as a matter

of law.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

II.

In its answer, Hainan asserts a counterclaim based on breach of the implied warranty of

merchantability as provided by § 2.314 of the Texas Business and Commerce Code.[3]  Section

2.314 reads:

> (a) Unless excluded or modified (Section 2.316), a warranty that
> the goods shall be merchantable is implied in a contract for their
> sale if the seller is a merchant with respect to goods of that kind.
> Under this section the serving for value of food or drink to be
> consumed either on the premises or elsewhere is a sale.
>
> (b) Goods to be merchantable must be at least such as
>
> (1) pass without objection in the trade under the contract
> description;  and
>
> (2) in the case of fungible goods, are of fair average quality
> within the description;  and
>
> (3) are fit for the ordinary purposes for which such goods
> are used;  and

---

[3] The parties do not dispute that Hainan's warranty counterclaims are governed by Texas law and
in particular by Article 2 of the Uniform Commercial Code as adopted by the Texas legislature.

6

(4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;  and

(5) are adequately contained, packaged, and labeled as the agreement may require; and

(6) conform to the promises or affirmations of fact made on the container or label if any.

(c) Unless excluded or modified (Section 2.316) other implied warranties may arise from course of dealing or usage of trade.

As the language of § 2.314 expressly recognizes, a merchant is free to disclaim the

implied warranty of merchantability so long as the disclaimer complies with the strictures of §

2.316, which provides in relevant part:

(a) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other;  but subject to the provisions of this chapter on parol or extrinsic evidence (Section 2.202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(b) Subject to Subsection (c), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(c) Notwithstanding Subsection (b)

(1) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty;  and

7

(2) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him;  and

(3) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

Accordingly, "it is well established under Texas law that implied warranties can be expressly disclaimed." *Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.,* 369 F. Supp. 2d 848, 856 (E.D. Tex. 2004) (citing *Alcan Aluminum Corp. v. BASF Corp.,* 133 F. Supp. 2d 482, 497 (N.D. Tex 2001)).  Section 2.316(b) simply requires that such disclaimers " be in writing and conspicuous." *Id.* "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." *Id.* (quoting *Arkwright-Boston Mfgrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.,* 844 F.2d 1174, 1183 (5th Cir. 1988)).  Section 1.201(10)(A) defines "conspicuous" as follows:

"Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:

(A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size . . .

As the term "include" connotes, the definition does not provide an exhaustive list, but merely "illustrates that 'the test is whether attention can reasonably be expected to be called to it.'" *Cronus Offshore, Inc.,* 369 F. Supp. 2d at 856 (quoting *Alcan Aluminum Corp.,* 133 F. Supp. 2d at 497)).  Texas courts have construed this as "an objective, rather than subjective, standard to

8

be determined by the court as a question of law." *Id.* (citing *Cate v. Dover Corp.,* 790 S.W.2d 559, 560 (Tex. 1990)).

After examining the documents, the court has little difficulty in concluding as a matter of law that the warranty disclaimer found on the invoices was conspicuous and satisfies the requirements of Texas Business and Commercial Code §§ 1.201(10) and 2.316(b). The disclaimer is located in the Terms and Conditions portion of the invoice, and is found under the heading "Warranties, Remedies and Disclaimers." Moreover, the disclaimer is set forth in all capital letters. Thus, the disclaimer is conspicuous enough so that an objective purchaser could reasonably be expected to have had his attention drawn to it. *Cronus Offshore, Inc.,* 369 F. Supp. 2d at 856; *Alcan Aluminum Corp.,* 133 F. Supp. 2d at 497; *Cate v. Dover Corp.,* 790 S.W.2d 559, 560 (Tex. 1990). Therefore, the court concludes that the disclaimer of implied warranties is valid and enforceable and Hainan's counterclaim for breach of implied warranties of merchantability fails as a matter of law.

III.

The DLT also argues that it is entitled to judgment on the remaining warranty counterclaims to the extent that Hainan is seeking consequential damages. The DLT asserts that the limitation of liability clause, which, by its terms, excludes such an award, is binding and must be strictly enforced. Hainan responds that both the limitation of remedy clause and the limited liability clause are nullities because of a failure of their essential purpose. The DLT counters by arguing that  even assuming the limitation of remedy clause has failed of its essential purpose, the limitation of liability clause would stand independently and preclude an award of consequential damages. The court finds the DLT's argument persuasive.

The relevant portion of the Texas Business and Commercial Code on the issue of limitation of remedies is § 2.719.  That section reads:

> (a) Subject to the provisions of Subsections (b) and (c) of this section and of the preceding section on liquidation and limitation of damages,
>
> (1) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and
>
> (2) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
>
> (b) Where circumstances cause an exclusive remedy to fail of its essential purpose, remedy may be had as provided in this title.
>
> (c) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.  Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

V.T.C.A., Bus. & C. § 2.719.

This particular section of Article 2 of the Uniform Commercial Code (which Texas enacted verbatim as Article 2 of the Texas Business and Commercial Code) has caused some division of opinion among courts because of an apparent conflict between subsections (b) and (c).[4]  Under subsection 2.719(a), a seller may limit a buyer's remedies to the repair or replacement of the goods.  However, subsection 2.719(b) invalidates this limitation where the

---

[4]  In the actual text of the Model Uniform Commercial Code, the relevant subsections are labeled 2-719 (2) and (3), and the majority of legislatures have enacted the Code with that numbering.

10

limited remedy fails of its essential purpose, entitling the buyer to all the remedies of the Code, including consequential damages.  Subsection 2.719(c) permits the seller to exclude consequential damages unless such exclusion is unconscionable.  The ambiguity arises where a seller, like DANA, has limited a buyer's remedy *and* has excluded consequential damages, but the buyer alleges that the limited remedy has failed of its essential purpose.  It is unclear from the text of the statute whether a court is required to apply a standard of unconscionability before allowing the buyer to recover consequential damages, or whether the failure of essential purpose alone suffices.

Given the ambiguities of the statute, it is not surprising that there are two distinct lines of cases dealing with this issue.  Unfortunately, as the parties concede, no reported Texas decision has determined whether subsection 2.719(b) trumps subsection 2.719(c), or whether the two provisions stand independently.  Accordingly, it is the job of this court  to predict how the Texas Supreme Court would rule if presented with this question.  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 418 (4th Cir. 1999); *see* Tex. Bus. & Com. Code § 1.301; *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487 (1941)*; In re Merritt Dredging Co., Inc,* 839 F.2d 203 (4th Cir. 1988).   In its quest, the court must consider the text and policy of the statute as enacted by the Texas legislature, the policy inclinations of the Texas Supreme Court, and may also consider the decisional approaches taken by other jurisdictions.  *Id.*; *see Stool v. J.C. Penney Co.,* 404 F.2d 562, 562 (5th Cir. 1968) ("Thus where the controlling state law eludes the researcher, the court must attempt to ascertain the policy inclinations of the state's highest tribunal with regard to the matter in controversy.  Failing that, the court may assume that the state courts would adopt the rule which, in its view, is supported by the thrust of logic and authority.").

11

This court concludes that the Texas Supreme Court would construe subsections 2.719(b) and (c) as independent provisions.  First, the plain text of the statute appears to favor such a reading.  The drafters set subsections 2.719(b) and (c) apart without reference one to another, suggesting that the drafters intended those subsections to be read independently.  Moreover, subsection 2.719(c) refers specifically to consequential damages, while subsection 2.719(b) speaks more generally of remedies.  Applying the conventional rule of statutory construction, the more specific language of subsection 2.719(c) would control the more general language of subsection 2.719(b).  2A N. Singer, Statutes and Statutory Construction § 46.05 (4th ed. 1984) ("When there is inescapable conflict between general and specific terms or provisions of a statute, the specific will prevail.").

Additionally, the two subsections appear to serve distinct purposes.  Subsection 2.719(c)'s view is retrospective in that it looks to the time of contract formation to determine whether a waiver of consequential damages is unconscionable.[5]  On the other hand, subsection 2.719(b) is prospective, as it looks to performance under the contract to determine whether a

---

[5]  The Texas UCC does not define the term "unconscionable."  However, the official comment to § 2.302 provides:

> The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances *existing at the time of the making of the contract*. . . . The principle is one of prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power.

(emphasis added).

12

limitation of remedies has failed of its essential purpose.  Other courts have considered these

differences to be highly probative of legislative intent:

> A number of logical and sound reasons mandate why, without
> more, the failure of a limited remedy of repair should not
> invalidate a wholly distinct clause of the contract excluding
> recovery of consequential damages.  In the first place, the
> substantive content of subsections (2) and (3) of the statute are
> distinctly different.  Subsection (2) focuses on failure of essential
> purpose while subsection (3) depends on a judicial determination
> of unconscionability.  Also, unconscionability deals primarily with
> a grossly unequal bargaining power at the time the contract is
> formed, while failure of essential purpose relates to circumstances
> arising during performance of the agreement.

*Envirotech Corp. v. Halco Engineering, Inc.,* 234 Va. 583, 592–93, 364 S.E.2d 215, 220 (1988).

Also, Official Comment 3 to § 2.719 supports the conclusion that subsections 2.719(b)

and (c) were intended to stand as independent provisions.  Comment 3 provides:

> Subsection [c] recognizes the validity of clauses limiting or
> excluding consequential damages but makes it clear that they may
> not operate in an unconscionable manner.  Actually such terms are
> merely an allocation of unknown or undeterminable risks.  The
> seller in all cases is free to disclaim warranties in the manner
> provided in Section 2-316.

As one court noted:

> Comment 3 thus recognizes that business entities may want to
> allocate certain risks between the parties and under the philosophy
> of the UCC should be free to do so provided that such a waiver is
> not actually unconscionable.  It often makes much commercial
> sense for parties to agree that the buyer will shoulder the risk of
> consequential losses.  The seller may not be in a position to
> evaluate the extent or likelihood of consequential damages, since
> these risks are largely determined by the buyer's unique business
> circumstances.  Likewise, a buyer may rationally agree to assume
> the risk of consequential losses rather than pay a higher price for
> the goods, a price which would necessarily include what amounts
> to an insurance premium for the seller's assumption of the risk of
> consequential losses.  It would largely undermine the liberty of

13

> business entities to allocate unknown or indeterminate commercial
> risks as they see fit to make the validity of a freely negotiated
> consequential loss waiver under 2-719(3) dependent on the success
> of a quite distinct contractual provision concerning limitation of
> remedy under 2-719(2).

*Eastman Chemical Co. v. Niro, Inc.,* 80 F. Supp. 2d 712 (S.D.Tex. 2000) (interpreting identical language as it appeared in the Tennessee Uniform Commercial Code).  As expressed in other contexts, the Texas Supreme Court has given tremendous deference to this legislative policy of freedom of contract and allocation of risks and obligations.  *See Cate v. Dover,* 790 S.W.2d 559, 567 (Tex. 1990) (Spears, J., concurring)  (expressing that the court must strictly apply the statutory language of § 2.316, which provides for the disclaimer of implied warranties, even though such disclaimers may at times be abusive to buyers, and in opposition to the equitable philosophy of the court).

Even though the Texas courts have not specifically ruled on the issue, the overwhelming majority of jurisdictions have adopted the view that subsections 2.719(b) and (c) are independent provisions.  Given this fact, and no evidence of a contrary Texas policy, this court finds that the Texas Supreme Court would likely adopt the majority rule.  *See Eastman Chemical,* 80 F. Supp. 2d at 721–22 (collecting cases from many  jurisdictions adopting the view that 2.719(b) and (c) are independent provisions).

The leading case expressing the majority view is *American Electric Power Co., Inc. v. Westinghouse Electric Corp.,* 418 F. Supp. 435 (S.D.N.Y.1976).  In that case, the court considered a warranty provision which limited the buyer's remedies to repair or replacement of the goods, and a limited liability provision that precluded the buyer's recovery of consequential damages.  The buyer alleged that both of the contract provisions were invalid on grounds that the

14

seller was dilatory in rendering repairs, and consequently the warranty provision had failed of its

essential purpose.  Urging that the court should read subsections 2.719(b) and (c) of the UCC as

dependent provisions, the buyer argued that if the limited and exclusive remedy of repair and

replacement of the warranty provision had failed of its essential purpose, the bar upon recovery

of consequential damages was likewise void.  Rejecting this argument, the court concluded that

subsections 2.719(b) and (c) stand as separate and independent provisions.  Explaining its

reasoning, the court found "no reason to disturb the consensual allocation of business risk

embodied in the . . . contract."  *Id.* at 458.  It noted that "where an exclusive remedy (such as a

warranty to repair or replace) fails of its essential purpose, it may be ignored, and other clauses

in the contract which limit remedies for breach may be left to stand or fall independently of the

stricken clause.  Since it cannot be said that the Limitation of Liability (which barred

consequential damages) is unconscionable it must be given effect."  *Id.*

In their treatise on commercial law, Professors White & Summers express their

agreement with this line of reasoning:

> In general, we favor the *American Electric Power* line of cases.
> Those cases are most true to the Code's general notion that the
> parties should be free to contract as they please.  The text of the
> Code disfavors judges' and juries' rewriting contracts that allocate
> risks between the parties.  UCC sections 1-102, 2-316, 2-719, and
> many others accord primacy to the terms of the contract over the
> general law of the Code.  Indeed, as to remedies 2-719(1)(a) and
> (b) provide that the parties may provide for remedies "in
> substitution for those provided in the article" and that the parties
> may make such remedies "exclusive."

1 White & Summers, Uniform Commercial Code § 12-10 (4th ed.).

Although, as noted, the Texas courts have not specifically ruled on the interrelationship

between subsections (b) and (c), Hainan cites dicta from *PPG Industries, Inc., v. JMB/Houston*

15

*Centers Partners Ltd. P'ship,* 146 S.W.3d 79, 101 (Tex. 2004), as evidence that the Texas

Supreme Court would likely conclude that 2.719(b) "trumps" 2.719(c).  The court cannot agree.

In *PPG Industries, Inc.,* a purchaser of an office building brought an action against a window

manufacturer for breach of warranty and violation of the Texas Deceptive Trade Practices-

Consumer Protection Act, V.T.C.A., Bus. & C. § 17.50.  The language relied upon by Hainan

appears in a passage where the court was instructing the parties on the differences between a

limitation of remedy and the accrual date of the limitation period for a breach of warranty action.

The court explained:

> JMB confuses a limitation of remedy with a breach of warranty.
> The UCC specifically allows parties to limit the remedies for
> breach of a warranty to repair or replacement . . .
>
> * * *
>
> There are consequences connected to a seller's failure to comply
> with a limited remedy, but changing the accrual date of limitations
> is not among them.  "Where circumstances cause an exclusive or
> limited remedy to fail of its essential purpose, remedy may be had
> as provided [by the UCC]." [V.T.C.A. § 2.719(b)].  In other words,
> when PPG stopped supplying additional Twindows in 1989, JMB's
> remedies were no longer limited to replacement; all damages
> provided by the UCC became available.  But it neither stopped nor
> started the limitations for breach of the underlying warranty.

*PPG Industries Inc.,* 146 S.W.3d 79, 101.  Unfortunately, this language is of no assistance to

Hainan.

First, the Texas Supreme Court was referring to a limitation of remedy clause found in

the contract, and it seems plain from the language of the opinion that, under Texas law, if a

limitation of remedy clause appears in the body of a contract, this limitation is waived upon a

showing that the limitation has failed of its essential purpose.  V.T.C.A. § 2.719(b).  However,

the court never discussed the result under Texas law if the same contract also contained a limited

16

liability clause shielding the buyer from consequential damages.  Secondly, the Texas court

never cited to subsection 2.719(c), and made no remarks as to the legal issue of whether

subsections 2.719(b) and 2.719(c) are independent or dependent provisions.  Consequently, the

dicta in *PPG Industries, Inc.,* provides this court with no guidance on the issue.

In sum, this court concludes that under Texas law, even if the limitation of remedy clause

has failed of its essential purpose, the separate limitation of liability clause, which disclaims all

consequential damages, is valid under Texas Business and Commercial Code § 2.719(c).

Accordingly, the Court will enter summary judgment for the DLT on Hainan's warranty

counterclaims to the extent that they seek consequential damages.

IV.

The DLT also seeks summary judgment on the invoices that were generated during the

course of an audit that was conducted at the consignment parts warehouse in 2002.  The audit

was conducted by Timothy A. McKerrow, Senior Spares Administrator for DANA, from

November 7, 2002, through November 22, 2002.  (McKerrow Aff. ¶¶ 13, 14, 18).  In his

affidavit, Mr Kerrow states that after conducting the audit and conferring with Mr. Jason Xu, an

employee of Hainan, he issued seven invoices to Pacific American for parts that Hainan had

removed and consumed from the consignment warehouse.  (McKerrow Aff. ¶¶ 20–22, 24).  The

audit invoices totaled $1,629,277.33.  (McKerrow Aff. ¶¶ 23).

To rebut the DLT's claim, Hainan offers only the affidavit of Mr. Xu.  However, Mr. Xu

simply states that he never confirmed nor denied that Hainan had removed and consumed the

consignment parts.  (Xu Aff. ¶¶ 4, 6).  Specifically, Mr. Xu states, "I think I neither confirmed

17

that Hainan used the parts that Mr. McKerrow listed as having been consumed, because I have [*sic*] no authority to do so at that time."  (Xu. Aff. ¶ 6).

The DLT has provided evidence that DANA provided spare parts to Hainan; that those parts were stored in the consignment warehouse located at Hainan's primary maintenance base in Hainan, China; and that those spare parts are no longer found in the warehouse inventory. These facts lead to the reasonable inference that Hainan removed and consumed those parts. *See Beale v. Hardy*, 769 F.2d at 214.  That inference being established, in order for Hainan to prevail it "must do more than present a "scintilla" of evidence in its favor. . . . [I]f the evidence is 'merely colorable' or 'not significantly probative,' a motion for summary judgment may be granted. *Sylvia Development Corp. v. Calvert County, Maryland*, 48 F.3d 810 (4th Cir. 1995) (quoting *Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir. 1992), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993)).

Hainan has failed to provide any specific evidence that it is not liable on the audit invoices.  Mr. Xu's affidavit fails to claim that Hainan did not consume the parts; it merely states that "I *think* I neither confirmed that Hainan used the parts." (Xu. Aff. ¶ 6) (emphasis added). Furthermore, nothing in the affidavit tends to show that the audit was not properly conducted or that the parts Mr. McKerrow identified as missing were never received.  At bottom, Mr. Xu's affidavit amounts to no more than an unwillingness to concede the merits of the DANA's claim. As such, it is functionally no different than the denials in its answers.  *See* Fed. R. Civ. P. 56(e) (providing that adverse party may not rest upon the allegations or denials of its pleadings but must, by affidavits or otherwise "set forth specific facts showing there is a genuine issue for trial.")

The remaining contentions of Hainan are equally unmeritorious.  Hainan argues that summary judgment should not be granted because there are material issues in dispute as to the amount owed on the invoices, and to whom payment should be made.  As to thirteen of the spare parts (the invoice values of which total $170,454.00), FDG joins in opposing summary judgment and asserts that it, rather than DANA, is entitled to payment.  The DLT concedes this point for the purposes of summary judgment, and is seeking summary judgment only as to the remaining $1,458,823.33.

Hainan also claims that the DLT is precluded from summary judgment because DANA sent the audit invoices to Pacific American rather than directly to Hainan.  This argument is without merit because Hainan has already admitted that Pacific American was its "duly authorized and disclosed agent with regard to the acquisition of New Spare Parts."  (Def.'s Original Ans. to Sec. Amend. Compl. ¶ 14).  In addition, Mr. McKerrow stated  that the audit invoices were sent to Pacific American because Mr. McKerrow understood Pacific American "to be HNA's (Hainan's) agent and representative in the United States" and that this action was "[c]onsistent with past practices." (McKerrow Aff. ¶¶ 22, 23).  It is a rudimentary tenet of agency law that a principal may be held liable for an agent acting within his scope of authority. *See e.g.,* Restatement (Second) of Agency §§ 140, 144.  Accordingly, the Court finds that the DLT is entitled to partial summary judgment with respect to that portion ($1,458,823.33) of the audit invoices as to which there is no competing claim by FDG.

## V.

Lastly, the DLT seeks summary judgment against FDG based on Hainan's request for declaratory judgment on the issue of whether DANA or FDG owns the accounts receivable

generated by the consumption of consignment spare parts.  In its pleadings, FDG claims that it is

due $1,990,555.35 from Hainan.  The DLT requests summary judgment that DANA is entitled to

any amounts over that sum.  In effect, the DLT seems to be asking for a preemptive ruling that

FDG is bound by, and may not later seek to amend,  its pleadings  Such a ruling would be plainly

inconsistent with the policy, set forth in the Federal Rules of Civil Procedure, requiring a court

to "freely" allow a party to amend its pleadings to conform to the evidence at trial "when the

presentation of the merits of the action will be subserved thereby" and the objecting party fails to

show that it would be prejudiced.  Fed. R. Civ. P. 15(b), *incorporated by* Fed.R.Bankr.P. 7015.

Accordingly, this Court declines to grant summary judgment that would effectively preclude

FDG from later seeking to amend its pleadings.

Conclusion

A separate order will be entered consistent with this opinion granting partial summary

judgement to the DLT against Hainan with respect to the warranty counterclaims for breach of

implied warranties and for consequential damages as well as for $1,458,823.33 due on the audit

invoices.


Date: _____          _____
                                        Stephen S. Mitchell
Alexandria, Virginia                    United States Bankruptcy Judge

Copies to:

Dylan G. Trache, Esquire
Wiley Rein & Fielding, LLP
7925 Jones Branch Drive, Suite 6200
McLean, VA   22102
Counsel for the plaintiff

Brian J. Hurst, Esquire
Baker & McKenzie LLP
2001 Ross Avenue, Suite 2300
Dallas, TX   75201
Counsel for defendant and third-party plaintiff

Robert M. Marino, Esquire
Reed Smith LLP
Suite 1100 - East Tower
Washington, DC   20005-3317
Local counsel for defendant and third-party plaintiff

Patrick L. Huffstickler, Esquire
Cox Smith Matthews Incorporated
112 East Pecan St., Suite 1800
San Antonio, TX   78205
Counsel for third-party defendant

Kimberly L. Nelson, Esquire
Hunton & Williams, LLP
1751 Pinnacle Dr., Suite 1700
McLean, VA   22102
Local counsel for third-party defendant