UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: ) | |
| ) | |
|     DORNIER AVIATION (NORTH ) | Case No. 02-82003-SSM |
|     AMERICA), INC. ) | Chapter 11 |
| ) | |
|         Debtor ) | |
| ) | |
| DANA LIQUIDATING TRUST ) | |
| ) | |
|         Plaintiff ) | |
| ) | |
| vs. ) | Adversary Proceeding No. 03-1338 |
| ) | |
| HAINAN AIRLINES CO., LTD. ) | |
| ) | |
|         Defendant/Third Party ) | |
|         Plaintiff ) | |
| ) | |
| vs. ) | |
| ) | |
| DR. EBERHARD BRAUN *et al.* ) | |
| ) | |
|         Third Party Defendants ) | |

**MEMORANDUM OPINION**

This is an action by a liquidating trustee under a confirmed chapter 11 plan to recover approximately $5.8 million claimed to be owed by Hainan Airlines Co., Ltd. ("Hainan") to the debtor, Dornier Aviation (North America), Inc. ("DANA"). Summary judgment has previously been entered in favor of the trustee in the amount of $2.9 million. Certain consignment-related claims, as well as all claims between Hainan and third-party defendants Fairchild Dornier GmbH and Dr. Eberhard Braun have been stayed in favor of arbitration. Trial of the remaining

1

issues—which was consolidated with the trial of a similar action against Pacific American Corporation ("PAC"), an affiliate of Hainan[1]—was held on August 21, 22, 23, and 24, 2006. For the reasons stated, the court concludes that the liquidating trust is entitled to judgment against Hainan in the amount of $2.7 million. This opinion constitutes the court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(a).

Procedural Background and Findings of Fact

A.

The debtor, Dornier Aviation (North America), Inc. ("DANA") was the American subsidiary of a German aircraft manufacturer, Fairchild Dornier GmbH ("FDG"). On August 20, 1999, Hainan entered into an Aircraft Purchase Agreement with FDG's predecessor, Dornier Luftfahrt GmbH ("DoLuft"), to buy 19 Dornier 328 Jet aircraft. Sales and service support to DoLuft (and later FDG) customers in North America, South America and Asia was provided by DANA, which was located in San Antonio, Texas. As a result, DANA became the point of contact for providing Hainan with spare aircraft parts and repair services for its fleet of Dornier 328 Jet aircraft.

The warranty and repair program administered by DANA were set forth in three documents: the Purchase-Lease Agreement, the Vendor Information Manual, and the Customer Support Manual. DANA acted as an intermediary between Hainan on the one hand and FDG

---

[1] A separate memorandum opinion has been issued dismissing the action against PAC because it was a disclosed agent of Hainan. *DANA Liquidating Trust v. Pacific American Corp. (In re Dornier Aviation (North America), Inc.)*, No. 02-82002, A.P. No. 03-1319 (Bankr. E.D. Va., Jan. 5, 2007).

and other vendors on the other with respect to parts supplied by them or installed as original equipment on the aircraft. Additionally, DANA sold Hainan hundreds of spare parts between April 2000 and October 2002. At the time Hainan purchased the aircraft, either FDG or DANA had provided Hainan with an initial provisioning list of recommended spare parts. The testimony is conflicting as to how many of the recommended parts Hainan purchased. Clifton Duffy, who had been sent to China as the technical representative for the 328 Jet, testified that Hainan purchased only approximately fifty percent of the recommended parts on the list, resultinf in increased Aircraft on Ground ("AOG") downtime when Hainan did not have a needed part on site and it had to be shipped from San Antonio or Germany. By contrast, the testimony of Hainan's Spare Parts Deputy Manager, Zhu Hong, also known as Cathy Zhu, was that Hainan had purchased over 90 percent of the "component" parts on the list and 80% or more of "consumption" parts.[2]

During the course of its business relationship with DANA, Hainan, either directly or though its agent, PAC, purchased numerous spare parts and also returned numerous parts for servicing or exchange. DANA obtained the spare parts for Hainan either from FDG or from third party vendors and issued invoices to Hainan or PAC for the price of the part and any repair charges not covered by warranty. DANA's own warranty, which is set forth as part of the General Terms and Conditions of Sale on the invoices, was that the parts shipped "will be free from defects in materials and workmanship for a period of thirty (30) days from the date of

---

[2] She explained that component parts are rotable parts, meaning that they could be repaired and reused, while consumption parts were those that were expendable and could only be used once, such as screws, washers, and bolts.

shipment."[3]  The third-party vendors issued two-year warranties for their parts.  In addition, FDG provided a two-year warranty on the aircraft itself.  If a part was under warranty, it was repaired free of charge and returned to Hainan.  If a warranty claim was denied by a vendor, DANA in turn would deny Hainan's warranty claim, unless the aircraft from which the part came was still under its two-year warranty from FDG.  Warranty claims were denied for several reasons, including acts of God, damage from foreign objects, customer-induced damage, self-help repair, repair by an unauthorized repair shop, or, in many cases, because there was no fault found with the part.  Before any repair was done on a part for which a warranty claim had been denied, Hainan had to authorize the repair.

In addition to servicing and repairing parts, DANA also provided Hainan with a warranty exchange program for defective or damaged parts.  The exchange program allowed a customer to receive needed parts when it could not afford to wait the time it took to return a part to DANA, have the part serviced, and sent back.  The terms of the warranty exchange program differed based on whether the part was a "proprietary part" —that is, a part manufactured by FDG — or a "supplier part" —that is, a part manufactured by a third party vendor.

---

[3]  The remedies provided for in DANA's 30-day warranty were as follows:

> 1. replace the defective part by shipping a replacement part to Buyer at Seller's expense, whereupon Buyer will return the defective parts or material to Seller at Buyer's expense: or
> 2. request Buyer to return the defective parts or material, at Buyer's expense, for repair and return by Seller at Seller's expense: or
> 3. authorize Buyer to repair the defective part with Seller furnished kits/or parts in accordance with Seller's instructions.

Implied warranties of merchantability or fitness for a particular purpose were expressly excluded, as was any liability for consequential damages.

A warranty exchange for a proprietary part commenced when Hainan issued a purchase order to DANA for a warranty exchange. DANA shipped the replacement part to Hainan free of charge (if the warranty claim was valid), and Hainan would return the damaged part (referred to as the "core") to DANA. DANA then serviced the core and placed it back into rotation as a rotable part. Hainan did not have to pay a fee or freight charge to return a core part to DANA.

A warranty exchange for a supplier part followed a similar process. When DANA received the part from Hainan, DANA shipped a replacement part and charged Hainan 5% of the list price for the part. Once DANA received the core from Hainan, DANA forwarded it to the appropriate supplier, which would then investigate the part, determine why it was not working, and issue a tear down report of its findings. If a core part was not returned within 15 days as required for warranty processing, the warranty exchange was converted to an outright sale, and DANA billed Hainan for the remaining 95% of the list price for the replacement part. Six of the disputed invoices, totaling $220,344.90, relate to asserted failures to return core parts. Ms. Zhu, however, testified although sometimes there was a delay in the return of the core parts, the delay resulted from the need to obtain customs clearance, and that sooner or later DANA did receive the part but did not cancel the special code it had issued to track the core return.

B.

Ms. Zhu testified to a multitude of problems she said Hainan had experienced involving premature parts failure, delays in obtaining needed parts, and denial of warranty claims. According to Ms. Zhu, the reliability of the spare parts obtained from DANA was low and constant replacements were required. Many times DANA was unable to provide a part, and when it did, the time between the order and delivery would sometimes exceed seven days. Many

5

parts, moreover, arrived without original air worthiness certifications, which under Chinese regulations prevented the parts from being used.

As a result of the frequent parts failures and other problems, Hainan experienced a large number of AOG situations. When Hainan could not obtain what it considered to be a satisfactory response to the problems it was reporting to FDG, it stopped paying DANA's invoices in mid-2001. In December of that year, FDG, in response to what it acknowledged was Hainan's dissatisfaction with the level of customer support it was then receiving, transferred its customer support for Hainan from DANA to FDG in Germany. Deft. Ex. F. According to Ms. Zhu, the shift did not solve the problems Hainan was having. In February 2002, FDG put Hainan on a "75/25" payment arrangement (also referred to in the testimony as "the 75% solution"). That is, in order to receive a part, Hainan had to pay, in advance of shipment, four times the cost of the part, with 25% of the payment covering the cost of the part, while the remaining 75% went to reduce the outstanding balance owed to both DANA and FDG. Ms. Zhu's testimony as to the amount of payments Hainan made under the "75/25" program was somewhat unclear (she testified through an interpreter) but it would appear that approximately $360,000 was applied to past due invoices, with FDG making the determination which invoices would be paid. While the testimony again was not entirely clear, it appears that FDG applied payments made under the 75% solution solely to invoices that originated with FDG and not to outstanding DANA invoices.

Jonathan Tripp, an aircraft structural engineer, testified that at Hainan's request he had performed a statistical analysis of the failure modes for certain types of parts supplied by DANA with a view to determining whether the parts were failing before their projected life (known as

6

the "mean time before replacement," or "MTBR"). Mr. Tripp did not examine any of the failed parts himself but relied on the rejection tags (written in Chinese) placed on the parts by Hainan's mechanics. The tags contained the serial number of the part, which could then be matched up with the repair order, containing the reason for removal in English, that was sent to DANA. Mr. Tripp asserted that the root cause of a component's failure could be determined from the rejection tag data, although he conceded that the best way to determine the cause would be by reviewing the tear-down report created by the vendor or repair facility. Because tear down reports are not normally provided to the airline, the rejection tag data was, according to Mr. Tripp, the "next best way" to determine the reason for a part's failure. In compiling his report, Mr. Tripp looked at the data for 48 different parts identified by Hainan as problematical and determined that many of them had failed well before the 75 to 80% of the manufacturer's predicted MBTF that would be considered satisfactory, and that many did not reach even 25% of MTBF. He presented a table of 28 parts that had particularly high failure rates and calculated the ratio of the actual time before failure to 75% of projected MTBR. Applying that ratio to the invoiced price of the parts, he calculated that $1,014,372.84 represented value that Hainan had not actually received.

C.

The trustee's witnesses disputed the picture painted by Ms. Zhu and Mr. Tripp of an abnormally high rate of part failure. Clifton Russell Duffy was sent to Hainan's base of operations in China in 1999 as the Fairchild Dornier technical representative for the 328 Jet. He testified that Hainan suffered from more AOG situations than it should have in part because it did not order (and thus did not have on hand) the full complement of parts recommended on the

initial provisioning list. Additionally, he testified that the salt air environment in which Hainan was flying contributed to a higher rate of part corrosion than would have been experienced in other parts of the world. He further testified that Hainan had sent some items to a non-FAA authorized repair shop in China and had also attempted its own repairs and diagnosis teardowns of some parts, all of which would later lead to denials of warranty coverage when the parts were sent back for repair or replacement. Mr. Duffy also testified that occasionally he witnessed Hainan mechanics improperly performing maintenance washes on the engines of the 328 Jet and noted that Hainan seemed to experience a high turnover of mechanics, with the result that institutional knowledge among the mechanic work force was constantly being lost every time a new mechanic had to be brought it. Nick Popovich, a former U.S. Navy aircraft maintenance officer with a number of years of experience in aircraft maintenance oversight, criticized Mr. Tripp's analysis as lacking essential supporting data, particularly tear down reports, and also as failing to exclude environmental problems such as dirt and salt air as possible factors contributing to failure.

D.

FDG commenced liquidating insolvency proceedings in Germany in April 2002, with Dr. Eberhard Braun being appointed as insolvency liquidator. Shortly thereafter, an involuntary petition under chapter 7 of the Bankruptcy Code was filed against DANA in this court on April 24, 2002. An order for relief and an order converting the case to chapter 11 were entered on May 20, 2002, and a plan of liquidation was confirmed on February 14, 2003. Under the plan, all of DANA's assets were transferred to the DANA Liquidating Trust ("DLT"). The DLT filed this adversary proceeding on December 5, 2003, to recover money owed to DANA from the

Hainan invoices.[4]  Summary judgment has previously been entered in favor of the DLT in the amount of $2,921,278.40,[5] leaving for trial 864 disputed invoices totaling $2,964,415.47.[6]  At the beginning of the trial, the DLT withdrew its claims related to 19 of those invoices totaling $29,203.61.  The remaining invoices in dispute have been broken down by the DLT into several broad categories:[7]

| Description | Invoices | Amount |
|---|---|---|
| Direct Sales | 264 | $1,920,586.69 |
| Full charge repairs/exchange without warranty | 43 | $55,458.97 |
| 5% exchange price transactions | 132 | $131,326.58 |
| Warranty freight charge only transactions | 206 | $14,409.85 |
| "No core returned" transactions | 6 | $230,344.90 |
| "No fault found" charges | 57 | $30,835.95 |
| "Additional charges"[8] | 84 | $88,009.94 |

---

[4]  The adversary proceeding against PAC had been commenced on October 14, 2006.

[5]  Of this amount, approximately $1.4 million related to so-called "audit invoices" for parts withdrawn from a spare parts consignment warehouse.  *DANA Liquidating Trust v. Hainan Airlines Co., Ltd. (In re Dornier Aviation (North America), Inc.)*, No. 02-82003, AP No. 03-1338, 2005 WL 3783829, 2005 Bankr LEXIS 2818 (Bankr. E.D. Va., December 30, 2005).  The other $1.46 million related to invoices as to which there was no dispute.  Order of April 14, 2006 (Doc. # 192).

[6]  The DLT also seeks interest at 18% per annum on the unpaid invoices plus reasonable attorneys's fees.  At trial, it requested that the court simply rule on the DLT's entitlement to interest and attorney's fees, with a further hearing to be held to determine their amount.

[7]  For each of the categories, the DLT has provided a spreadsheet summarizing the invoices, hard copies showing a sample of the invoices, and a CDROM with images of all the invoices.

[8]  From the sample provided, the invoices in this category all appear to involve repair charges where warranty coverage was denied based on a finding of customer induced damage.  Pltf. Ex. 8-B

9

| | | |
|---|---:|---:|
| "Billing corrections"[9] | 57 | $485,316.00 |
| Total | 849 | $2,956,288.88 |

Among the General Terms and Conditions of Sale on the invoices are the following:

PAYMENTS
    Except as otherwise expressly provided for on this invoice, payment terms are net cash payable in United States currency within 30 days from invoice date. Late payments shall be subject to a late payment charge on the unpaid balance calculated monthly at the rate of one and onehalf (1 ½%) percent per month or, if less, the maximum rate permitted by applicable law. . . .
\* \* \*
COLLECTION
    Should Seller initiate collection action against Buyer, Buyer shall pay all costs of collection and attorney's fees incurred in connection with such action and any appeals taken therefrom.

## Conclusions of Law and Discussion

### I.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. Although an action to collect a debtor's accounts receivable is a non-core, related proceeding, *see Humbolt Express, Inc. v. The Wise Co., Inc. (In re Apex Express Corp).*, 190 F.3d 624 (4th Cir. 1999), the parties have consented to a final judgment being entered by a bankruptcy judge. *See* 28 U.S.C. § 157(c)(2). Venue is proper in this district under 28 U.S.C. § 1409(a). The defendant has been properly served and has appeared generally.

---

[9] From the sample provided, the invoices in this category all appear to involve amounts that were initially billed to PAC but should have been billed to Hainan. Pltf. Ex. 10-B.

II.

Hainan raises a number of defenses to payment of the invoices.  First, it denies that all of the invoiced parts were in fact shipped.  Second, it says that a great many of the parts that were shipped were defective and quickly failed and that DANA failed to repair or ship parts within the agreed time constraints.  And third, it says that it was not given proper credit for payments it made under the "75% solution" as well as for certain parts it says were sent to DANA for repair but never returned.  Each of these issues will be discussed in turn.

A.

As a threshold matter, Hainan challenges the trustee's evidence that all of the parts for which he is seeking payment were even shipped.  The evidence showed that for routine spare parts purchases, Hainan placed orders to DANA through Pacific American Corporation ("PAC"), an affiliate of Hainan which was located in New York City, but dealt directly with DANA for repairs or when parts were urgently needed.  For routine parts purchases, Hainan would determine the type and number of parts needed and would issue a purchase order to PAC.  PAC in turn would issue a purchase order to DANA, which would ship the part by Federal Express to Market Pioneer International Corporation ("MPI"), a freight forwarder located in San Francisco that had been designated by PAC in the purchase order, for ultimate delivery to a Hainan affiliate, Hainan Airlines Export-Import Co., Ltd., in Haikou, Hainan, China.  DANA would contemporaneously issue an invoice to PAC for the purchase price of the parts.  Hainan does not dispute that PAC was its agent and had authority to order parts on its behalf.  For the vast majority of the parts in question, the trustee's evidence includes not only copies of the invoices but copies of the shipping documents.  No evidence was presented by Hainan that any specific

11

invoiced part was not received, and, with the exception of 13 relatively small invoices for which the trustee did not supply copies of shipping documents, the court is satisfied that the evidence showing that the parts were shipped to Hainan's designated freight forwarder gives rise to a reasonable inference that they ultimately arrived at their destination, especially in the absence of any evidence by Hainan disputing that specific items were shipped.  The 13 invoices for which shipping documents are lacking total $7,117.79.[10]  Except, however, for the parts represented by those invoices, the court finds that the trustee has carried his burden of showing that the parts for which he is seeking payment were actually shipped.  The court additionally finds that, with the exception of one category of invoices, the trustee has carried his burden of showing that the other invoices in dispute accurately reflect sums owed by Hainan.  The one exception consists of the "no core return" invoices.  Weighing Ms. Zhu's testimony that the cores were eventually returned, with any delays resulting from the need to obtain customs clearance, the court is unable to find, based solely on the debtor's accounting records, that the cores were not returned.

---

[10]  The invoices in question are as follows:

| Invoice No. | Amount | Cust. | Transaction Type |
|---|---|---|---|
| 90012257 | $220.00 | PAC | Order - Spare parts |
| 90012267 | $169.40 | PAC | Order - Spare parts |
| 90012268 | $106.90 | PAC | Order - Spare parts |
| 90014067 | $2,286.90 | PAC | Exchange w. warranty |
| 90017252 | $70.60 | HNA | Order - Spare parts |
| 90017340 | $134.00 | HNA | Order - Spare parts |
| 90017527 | $1,204.50 | HNA | Order - Spare parts |
| 90019590 | $726.70 | HNA | Repair with Warranty |
| 90020040 | $907.00 | PAC | Order - Spare parts |
| 90020041 | $907.00 | PAC | Order - Spare parts |
| 90020206 | $323.40 | HNA | Order - Spare parts |
| 90022904 | $14.99 | HNA | Warranty Exchange |
| 95001293 | $46.40 | HNA | Repair with Warranty |

Accordingly, the court will disallow the no core return invoices as a component of the DLT's claim.[11]

B.

Hainan's primary defense is that it is excused from payment by a breach of warranty so pervasive as to amount to a failure of consideration. In this connection, it must be remembered that DANA's own warranty was a rather limited one. DANA warranted that the parts it shipped "will be free from defects in materials and workmanship for a period of thirty (30) days from the date of shipment," with remedies limited to repair or replacement of the defective part. With respect to the much longer warranties provided by FDG and other vendors, DANA acted only as an intermediary.

The testimony presented by Hainan is insufficient to show that any particular part for which DANA now seeks payment failed within 30 days of being shipped or — if it did — that DANA failed to repair or replace the part. The testimony of Ms. Zhu was long on generalities about the frequency of parts failures but short on specifics. Mr. Tripp's analysis, though considerably more detailed, nevertheless does not address when, in relationship to the shipping date, any particular part may have failed. To take an example, the part he reports as having the

---

[11] The invoices in question are as follows:

| Invoice No. | Amount |
|---|---|
| 95003712 | $100,480.55 |
| 95003713 | $61,394.70 |
| 95003714 | $36,832.45 |
| 95004471 | $7,410.95 |
| 95004514 | $6,815.30 |
| 95004515 | $7,410.95 |

13

highest rate of failing to reach at least 70% of the manufacturer's published MTBR is the Hall Effect Sensor (Part No. 103-020-0). According to his summary, only 1% of the 93 failed sensors had reached 75% of MTBR. The MTBR for that part is 204,880 flight hours, and the reported flight hours on the sensors reported as defective ranged from 0 to 5,902 flight hours, with the average being 2,238 flight hours. Since no evidence was presented as to the number of flight hours Hainan's aircraft would typically log in a day (or week or month) the court is without any basis for determining if the failures, or some reasonably quantifiable portion of them, occurred even within 30 days of the part having been installed, let alone within 30 days of being shipped. Although the vendor and manufacturer warranties were considerably longer than 30 days, any claim for breach of those warranties would have to be asserted against the vendor or manufacturer, not against DANA.

The question nevertheless remains whether the failure of the parts shipped to Hainan to meet expected standards of reliability, if sufficiently pervasive, could constitute a failure of consideration under Texas law. Texas courts recognize failure of consideration as a defense to an action for breach of contract "when, because of some supervening cause after an agreement is reached, the promised performance fails." *Stewart v. U.S. Leasing Corp.*, 702 S.W.2d 288, 290 (Tex. App. 1985). A failure of consideration may occur as a consequence of one party's failure to perform its obligations under the contract. *Citizens Nat'l Bank v. Rogers*, 449 S.W.2d 830 (Tex. App. 1969) (failure of sign company's assignee (a bank) to maintain signs leased to automobile dealer was complete defense to bank's rent claim for the sign); *US Bank, N.A. v. Prestige Ford Garland Ltd. P'ship*, 170 S.W.3d 272 (Tex. App. 2005) (error to grant summary judgment to assignee of vehicle leases when lessee offered evidence that the original lessor had

never acquired title to the vehicles). In the context of a sales contract, failure of consideration may be shown by the fact that the property is worthless or is not as it was represented by the buyer. *Worm v. Hoffman*, 244 S.W.2d 899 (Tex. App. 1952) (upholding jury verdict for buyer under a contract for the sale of beer where the beer was determined to be unfit for human consumption based on chemical testing and analysis). No Texas decision appears to have addressed whether a defense of failure of consideration will lie where there is an express, but limited, warranty, and where implied warranties of merchantability and fitness for a particular purpose have been validly disclaimed. Because recognition of such a defense would be inconsistent with the policy allowing commercially sophisticated parties to waive implied warranties of merchantability and fitness, the court concludes that such waivers cannot be circumvented merely by the expedient of recasting a claim for breach of warranty as a failure of consideration. Certainly, the legislature is free to enact a commercial equivalent to the "lemon laws" that exist to protect consumers in a number of states. In the absence of such legislation, however, courts should not lightly allow an end-run around otherwise valid waivers of warranty. Accordingly, Hainan's defense to payment grounded in failure of consideration is rejected.

C.

There remains the issue of whether Hainan was given proper credit for payments it made to FDG under the "75% solution" that was put into place after responsibility for customer support was shifted from DANA to Hainan. The unrebutted testimony is that FDG applied the payments received under the 75% solution solely to payment of its own overdue invoices. It is undisputed that FDG required the payments as a condition of continuing to do business with Hainan. No legal authority has been cited that would require FDG to apply the payments to the

amounts owed DANA instead of to FDG's own invoices.  Although the parties could certainly have contracted for such treatment, there is no evidence they did.  Even if it could be argued that DANA was simply FDG's surrogate or agent in terms of providing customer support, Hainan has pointed to nothing in the agreements between it and FDG requiring that payments not tied to a specific invoice be applied first to the oldest outstanding invoice.  So long as Hainan received full credit for the payments from someone, it is difficult to see how Hainan has been unjustly treated simply because the credit was applied to one particular set of invoices rather than to another.  Accordingly, the court concludes that Hainan has not been denied proper credit against the DANA invoices for payments made under the 75% solution.

## III..

In addition to the amount of the unpaid invoices, the DLT seeks also judgment for pre-petition interest and for attorneys fees incurred in bringing this action.  Both interest (at the rate of 18% per annum beginning 30 days after the invoice date) and attorneys fees are expressly provided for in the General Terms and Conditions of Sale that are set forth on the invoices.  In addition, it appears that even absent a contractual agreement to pay attorney's fees, Texas law would allow their recovery:

> A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:
> (1) rendered services;
> (2) performed labor;
> (3) furnished material;
> (4) freight or express overcharges;
> (5) lost or damaged freight or express;
> (6) killed or injured stock;
> (7) a sworn account; or
> (8) an oral or written contract.

V.T.C.A., Civil Prac. & Rem. Code § 38.001.  Hainan has cited no authority that would contradict the DLT's right to recover reasonable attorneys fees incurred in bringing and prosecuting this action.  Nor has it cited any authority that the 18% annual interest rate provided for in the Terms and Conditions of Sale exceeds the amount that is lawful under Texas law.  For that reason, the court concludes that the DLT is entitled to judgment for those amounts.  At trial, the DLT urged that, prior to the presentation of evidence to establish the amount of interest and attorney's fees, the court should first adjudicate which invoices were valid, and the court concurred with that procedure.  Accordingly, a separate hearing will be set to determine the amount of interest and attorneys fees that is properly due.

<u>Conclusion</u>

In summary, the court finds that the DLT has carried its burden of proving DANA's entitlement to the disputed invoices, except for the 13 for which there is sufficient evidence of shipment and the 6 "no core return" invoices.  The court further finds that Hainan has not carried its burden of showing that DANA breached its limited warranty with respect to the parts it shipped to Hainan.  A separate judgment will be therefore be entered in favor of the trustee in the amount, in addition to that for which summary judgment has already been granted, of $2,728,826.19, and a hearing will be set to determine the amount of allowable pre-judgment interest and attorney's fees to which the DLT is entitled.

Date: _____          _____
                                        Stephen S. Mitchell
Alexandria, Virginia                    United States Bankruptcy Judge

17

Copies to:

Dylan G. Trache, Esquire
Wiley Rein & Fielding, LLP
7925 Jones Branch Drive, Suite 6200
McLean, VA   22102
Counsel for DANA Liquidating Trust

Brian J. Hurst, Esquire
Baker & McKenzie LLP
2001 Ross Avenue, Suite 2300
Dallas, TX   75201
Counsel for Hainan Airlines Co., Ltd.

Robert M. Marino, Esquire
Redmon Peyton & Braswell, LLP
510 King Street, Suite 301.
Alexandria, VA 22314
Local counsel for Hainan Airlines Co., Ltd.

Patrick L. Huffstickler, Esquire
Cox Smith Matthews Incorporated
112 East Pecan St., Suite 1800
San Antonio, TX   78205
Counsel for Dr. Eberhard Braun and Fairchild Dornier GmbH

Kimberly L. Nelson, Esquire
Hunton & Williams, LLP
1751 Pinnacle Dr., Suite 1700
McLean, VA   22102
Local counsel for Dr. Eberhard Braun and Fairchild Dornier GmbH